**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ACTIVE WIRELESS TECHNOLOGIES LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 2:23-CV-00261-JRG |
| T-MOBILE USA, INC. and T-MOBILE US, INC., | § | |
| | § | |
| *Defendants*, | § | |
| | § | |
| ERICSSON INC. and NOKIA OF AMERICA CORPORATION, | § | |
| | § | |
| *Intervenors*. | § | |

**CLAIM CONSTRUCTION ORDER**

Before the Court is Active Wireless Technologies LLC's ("Plaintiff") Opening Claim Construction Brief. (Dkt. No. 70.) Also before the Court is the Defendants' / Intervenors' Responsive Claim Construction Brief (Dkt. No. 72) filed by Defendants T-Mobile US, Inc. and T-Mobile USA, Inc., and Intervenors Ericsson Inc. and Nokia of America Corporation (collectively, "Defendants" and with Plaintiff, the "Parties"), along with Active Wireless Technologies LLC's Reply Claim Construction Brief (Dkt. No. 73).

The Court held a *Markman* hearing on October 1, 2024. On the eve of the hearing, Defendants filed a Notice of Supplemental Evidence. (Dkt. No. 79.) The Court permitted Plaintiff to file a response and it did so on October 3, 2024. (Dkt. No. 87.) Having considered the Parties' briefing along with arguments of counsel, the Court resolves the disputes as ordered herein.

## I. BACKGROUND

Plaintiff alleges infringement of U.S. Patent No. 10,531,443, U.S. Patent No. 11,019,557 ("the '557 Patent"); U.S. Patent No. 10,785,764, and U.S. Patent No. 10,601,566 ("the '566 Patent") (collectively, the "Asserted Patents"), which are in the field of telecommunications, and they are more particularly directed to improvements in communication between user equipment and a base station. Only two of the Asserted Patents, the '557 and '566 Patents, contain terms that require claim construction and are therefore addressed herein.

The title of the '557 Patent is "Apparatus and method for acquisition of periodically broadcasted system information in wireless communication," and its Abstract states:

> A user equipment that communicates over a radio interface with a base station apparatus of a radio access network (RAN) comprises processor circuitry and receiver circuitry. The processor circuitry is configured to initiate a first type system information block (SIB) acquisition process to receive a first type SIB. The first type SIB comprises scheduling information of a second type SI message, the second type SI message comprising at least one system information block (SIB); and an indication of broadcast status for the second type SI message, the indication indicating broadcasting. The receiver circuitry is configured to receive the first type SIB. The processor circuitry is further configured to initiate an SI message acquisition process to receive the SI message. In a case that a stored version of one of the at least one second type SIB is not valid, the first type SIB acquisition process is initiated upon a failure of the SI message acquisition process.

The title of the '566 Patent is "Multiple slot long physical uplink control channel (PUCCH) design for 5th generation (5G) new radio (NR)," and its Abstract states:

> A user equipment (UE) is described. The UE includes a processor and memory in electronic communication with the processor. Instructions stored in the memory are executable to determine an uplink control channel (PUCCH) spans over multiple slots based on a signaling from a base station (gNB). The instructions are also executable to determine a demodulation reference signals (DMRS) structure in the configured multi-slot PUCCH. The instructions are further executable to determine a frequency hopping method of the configured multi-slot PUCCH. The instructions are additionally executable to determine uplink control information (UCI) encoding and loading methods on the configured multi-slot PUCCH. The instructions are also executable to determine a resource of a control channel for UCI feedback. The instructions are further executable to transmit UCI on a selected channel.

## II. LEGAL STANDARDS

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*); *aff'g,* 517 U.S. 370, 390 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.,* 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips,* 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular

claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

Intrinsic evidence, therefore, is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips,* 415 F.3d at 1312). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips,* 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). In those situations, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

However, the intrinsic record may not be sacrificed in favor of extrinsic evidence. According to *Phillips*, reliance on dictionary definitions, for example, at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." 415 F.3d at 1321.

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "[A] patent is invalid for indefiniteness if its claims,

read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* The claims "must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

The Parties have reached agreement on the following terms and constructions as submitted in their Joint Claim Construction Chart Pursuant to P.R. 4-5(d). (Dkt. 74-1.)

| Term | Agreed Construction |
|---|---|
| "the first type SIB comprising: scheduling information […]; a parameter associated with […]; and an indication of broadcast status […]"<br><br>('557, claims 9, 13) | The "first type SIB" comprising each of "scheduling information …", "a parameter associated with …", and "an indication of broadcast status …" |
| "the configured multiple slots PUCCH"<br><br>('566, claims 8, 16) | "the 'PUCCH span[ning] over multiple slots [] determined based on the signaling'" |
| "the long PUCCH"<br><br>('566, claim 11) | "the 'uplink control channel (PUCCH) [that] spans over multiple slots'" |
| "loaded to all to PUCCH UCI carrying symbols of each slot"<br><br>('566, claim 11) | "loaded to all PUCCH UCI carrying symbols of each slot" |

# IV. DISPUTED TERMS

## <u>U.S. Patent No. 11,019,557</u>

### 1. "a parameter associated with a condition for determination of a failure"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "a parameter associated with a condition for determination of a failure"<br><br>('557 Patent, claims 9, 13) | Plain and ordinary meaning | "a parameter used by the UE to determine that it has failed in the SI message acquisition process"<br><br>Alternatively, "a parameter used by the UE to make a determination of a failure based on a termination condition." |

The issue here is whether this claim term requires clarification to explain to the jury that "a parameter associated with a condition" must be used by the user equipment (UE) to determine whether there is a failure.

Plaintiff contends that Defendants' proposed constructions improperly requires the performance of a functionality by the UE when claims 9 and 13 do not contain this limitation and are instead directed to "a base station apparatus" and "a method for a base station apparatus." Plaintiff points out that embodiments in the specification disclose the base station as responsible for configuring the parameter and associated condition for determination of failure, and there is no similar requirement that such parameters be used by the UE. Plaintiff also submits an expert declaration from Mr. Regis (Bud) Bates in support of its argument that a person of ordinary skill in the art would have no trouble understanding the plain and ordinary meaning of this term.

Defendants respond that this term needs construction because a "parameter *associated with* a condition" and a "condition *for* determination of a failure" are unclear and confusing. According to Defendants, the specification sheds light on what this term means when it identifies a

component, the "system information acquisition failure detector 80" on the UE, as what uses the parameter associated with a condition to make the determination of when failure has occurred. Defendants cite to FIGS. 12 and 19 in support of their argument to show that the wireless terminal (UE) contains a system information acquisition failure detector 80 that is configured to make the determination of a failure of the SI message acquisition process.

Claim 9 recites as follows with the disputed phrase emphasized in bold:

> 9. A base station apparatus of a radio access network (RAN) that communicates over a radio interface with a user equipment, the base station apparatus comprising:
>
> transmitting circuitry configured to transmit a first type system information block (SIB), the first type SIB comprising:
>
> > scheduling information of a system information (SI) message, the SI message comprising at least one second type SIB, the scheduling information configuring SI windows, the SI windows comprising periodically occurring time windows in which the SI message is transmitted;
> >
> > **a parameter associated with a condition for determination of a failure of an SI message acquisition process**; and
> >
> > an indication of broadcast status for the SI message, the indication indicating broadcasting; and
>
> processor circuitry configured to cause the transmitting circuitry to broadcast the SI message; wherein:
>
> > the first type SIB is re-acquired by the user equipment upon the user equipment failing on the SI message acquisition process in at least one of the SI windows to receive the SI message,
> >
> > the base station apparatus is a current serving access node of the user equipment.

Claim 13 is a corresponding method claim that is similarly worded.

To begin analysis of this term, the Court looks first to the claim language and notes that both claims 9 and 13 are about the attributes of "a base station" that communicates with a UE.

Claim 9 is an apparatus claim about the components of a base station and claim 13 describes a method for a base station to communicate over a radio interface with UE. Neither claim is directed to the UE besides the UE being mentioned as the counterpart to the base station and recipient of the described transmissions. Notably, the '557 Patent includes other claims, such as claims 1 and 5, that are directed to the UE side of the system.

Claim 9 recites a base station apparatus comprising two sets of circuitry: (i) transmitting circuitry configured to transmit a first type system information block (SIB), and (ii) processor circuitry configured to cause the transmitting circuitry to broadcast the system information (SI) message. The disputed term is one of several attributes of the "first type SIB" to be transmitted from the base station to the UE. Thus, from the plain language of the claim, the "parameter associated with a condition" is an attribute of the SIB that is generated at the base station and configured to be transmitted to the UE for later use, such as to make a "determination of a failure of an SI message acquisition process." While "a parameter associated with a condition" may be intended to be used by the UE to determine whether a failure occurs, that later event is not explicitly covered by claim 9.

Similarly, claim 9 goes on to provide a scenario where "the first type SIB is re-acquired by the user equipment upon the user equipment failing on the SI message acquisition process in at least one of the SI windows to receive the SI message." According to the claim, a scenario may come to pass where the UE fails to acquire the SI message so it must re-acquire the SIB. But when and if that failure event occurs is determined by something outside the scope of claim 9. The claim language simply sets forth the potential occurrence of a failure event and what happens next.

The reach of a claim is not required to extend to every scenario described in the specification. Rather, the Court must adhere to the words of the claim that define the patented

invention. *Philips*, 415 F.3d at 1312. Here, the Court believes there is a reasonable limit on the claim scope because claim 9 is drafted to be about the base station. Only the base station's capability to transmit a first type SIB having a parameter associated with a condition for determination of a failure of an SI message acquisition process is claimed and that is as far as the claim extends. Who makes the determination of failure once the first type SIB is transmitted is omitted. The same is true with respect to claim 13, which is similarly worded. Therefore, the same analysis of claim 9 applies equally to claim 13.

The written description aligns with the limitations of the claim language. FIG. 22 shows that the "configuration parameters for at least one termination condition for determination of a failure of an SI message acquisition process" are included in the transmitted first type system information (SI) coming from the base station. ('557 Patent, 14:13–24.) While there are embodiments in the specification that describe a "system information acquisition failure detector 80" on the UE for using the "parameter associated with a condition" in making the "determination of a failure of an SI message acquisition process," these are particulars about the determination step in the UE not addressed in claims 9 or 13. Defendants' proposed clarifications (initial and alternative proposed constructions) extend beyond the scope of these claims and are rejected for this reason.

During the hearing, the Parties made two additional arguments that must be addressed for clarification of this and the subsequent term.

The first is whether the claim language presumes that a failure has already occurred as Defendants contend. The claim language of both claims 9 and 13 recites "a parameter associated with a condition *for determination of* a failure of an SI message acquisition process." Allowing for a determination suggests that whether a failure has occurred is yet to be determined. Therefore, the

failure is not presumed to have already occurred. The same is true as to the claim language "the first type SIB is re-acquired by the user equipment upon the user equipment failing on the SI message acquisition process" as the word "upon" means "if." In other words, if the UE fails, then the first type SIB is re-acquired. As the failure to acquire the SI message is not a requirement of the claims, the disputed term does not need clarification to identify who determines failure.

The second matter raised during the hearing is that both sides appear to conflate the first type SIB with the SI message, improperly equating the two.

Plaintiff argues that it is possible for the UE to not receive a given transmission of the first type SIB comprising the parameter because a subsequent claim limitation in both claims 9 and 13 recites the "user equipment failing on the SI message acquisition process," so if the UE does not receive the first type SIB, it would not be able to use the claimed parameter that is in that first type SIB. But such a situation is not addressed in the claim. Only if the SI message fails is the first type SIB re-acquired by the UE. The claims do not address the situation of what happens if the first type SIB fails to be acquired by the UE. Thus, the situation of the SI message failing does not inform what happens during failure of the first type SIB.

Defendants also confuse the two when arguing that the SI message is always part of the SIB, which is relevant to Defendants' argument that the following term is indefinite. Again, that does not appear to be the case. Just because the first type SIB is described as comprising the SI message (among other attributes) when the first type SIB is transmitted, it does not necessarily follow that the SI message is only transmitted as a part of the first type SIB. Indeed, the processor circuitry in claim 9 is configured to cause the broadcast of the SI message without recitation of the SIB. It is more reasonable that the SI message is separately broadcast once the first type SIB sets the SI windows as it is only when the SI message fails to be acquired during those windows is the

first type SIB then re-acquired. Indeed, FIG. 14 shows one transmission of SIB1 with three broadcasts of SI that were unsuccessfully acquired, followed by another round of SIB1. The distinction between the SIB and SI message does not support either side's arguments as to the disputed terms of the '557 Patent.

Lastly, the Court has considered the supplemental evidence and response submitted by the Parties and does not find the submissions persuasive. Defendants admit that the statements made during prosecution of the '557 Patent do not amount to lexicography or a clear disclaimer of claim scope and the Court agrees.

The Court therefore finds the claim term **"a parameter associated with a condition for determination of a failure" should be given its plain and ordinary meaning.**

2. **"wherein: the first type SIB is re-acquired by the user equipment upon the user equipment failing on the SI message acquisition process in at least one of the SI windows to receive the SI message"**

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "wherein: the first type SIB is re-acquired by the user equipment upon the user equipment failing on the SI message acquisition process in at least one of the SI windows to receive the SI message"<br><br>('557 Patent, claim 9) | Plain and ordinary meaning | Indefinite under § 112(b) |

The Parties dispute whether claim 9 of the '557 Patent is indefinite under *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) for reciting both an apparatus and a method of using the apparatus.

Plaintiff contends that *IPXL* does not apply because claim 9 is an apparatus claim that recites no method steps, but rather two structures configured to perform certain functions:

"transmitting circuitry configured to transmit . . . " and "processing circuitry configured to cause the transmitting circuitry to broadcast . . . ." The disputed claim term in the "wherein" clause following the "processor circuitry" element is, according to Plaintiff, directed to a further limitation on the first type SIB recited earlier in the "transmitting circuitry" element. Plaintiff analogizes this term to one this Court considered in *Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-CV-00055-JRG-RSP, 2017 WL 2190103 at *17–18 (E.D. Tex. May 17, 2017), where the Court found that two claimed structures are not indefinite when each was "configured to" perform certain functions followed by a wherein clause that further limited an object of the previously recited structures.

Defendants disagree, arguing that claim 9 improperly recites both a base station apparatus and at least one method step—the disputed "wherein" clause—which is untethered to any structural component and, thereby, renders the claims invalid. Defendants cite to *Rembrandt Data Techs., LP v. AOL, LLC, et al.,* 641 F.3d 1331, 1339 (Fed. Cir. 2011) as instructive, where a claim was invalidated for hybrid claiming when it recited four structural elements followed by a "transmitting" method step that stood alone, divorced from the preceding structural elements of the data transmitting device. Defendants argue that the method step of apparatus claim 9 requires an action to be taken by something other than the claimed base station. Just like how the "transmitting" step in *Rembrandt* was a step not claimed to be performed by the claimed transmitting device, here, according to Defendants, the re-acquisition of the first type SIB is performed by something other than (and divorced from) the claimed base station apparatus. Moreover, Defendants point out that the disputed language is identically written in claim 13, which is a method claim, and this further evidences the improper method step in apparatus claim 9.

The Supreme Court has read 35 U.S.C. § 112(b) to require that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S.Ct. at 2129. But when "a single claim cover[s] both an apparatus and a method of use of that apparatus," it fails to meet the requirements of § 112 because "it is unclear whether infringement . . . occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner]." *IPXL*, 430 F.3d at 1384. Yet, "apparatus claims are not necessarily indefinite for using functional language." *Microprocessor Enhancement Corp. v. Texas Instruments Inc*., 520 F.3d 1367, 1375 (Fed. Cir. 2008). If an apparatus claim "is clearly limited to a[n apparatus] possessing the recited structure and capable of performing the recited functions," then the claim is not invalid as indefinite. *Id*.

As an initial matter, the Court notes that Defendants do not dispute that claim 9 is an apparatus claim directed to a base station apparatus having transmitting circuitry and processing circuitry. Defendants only contend that the disputed limitation is drafted as a method step that is untethered to the disclosed structure.

Having reviewed the two competing cases cited by the Parties, the Court finds the term to be closer to *Huawei* than to *Rembrandt*. The claim in *Rembrandt* is a "data transmitting device for transmitting signals corresponding to an incoming stream of bits, comprising" four means-plus-function elements followed by the term at issue, "transmitting the trellis encoded frames." There, the "transmitting" term is written as a method step. Additionally, it is untethered to any structure as the only other mention of "transmitting" is in the preamble and the remaining recitations in the claim are four means-plus-function elements that identify no clear structural components. In contrast, the "wherein" clause at issue herein references the "first type SIB" that the "transmitting

circuitry [is] configured to transmit" as provided for earlier in the claim, and adds further detail that it can be "re-acquired by the user equipment upon the user equipment failing on the SI message acquisition process in at least one of the SI windows to receive the SI message." Accordingly, the re-acquisition of the first type SIB is not divorced from structures in the claimed base station apparatus.

The rationale in *Huawei* is instructive here. Like in *Huawei*, claim 9 is directed to a structure (a base station comprising transmitting circuitry configured to transmit a SIB) that is used in a particular network environment. *Huawei,* 2017 WL 2190103 at *64–65. The claim further includes a wherein clause that defines the network environment in which the SIB is transmitted: "wherein: the first type SIB is re-acquired by the user equipment upon the user equipment failing on the SI message acquisition process in at least one of the SI windows to receive the SI message" and "the base station apparatus is a current serving access node of the user equipment." Accordingly, claim 9 makes clear that infringement only occurs when one makes, uses, offers to sell, or sells the claimed apparatus: the base station that must be used in the particular network environment as described. *Id.*

Moreover, the Court does not find that something other than the claimed base station apparatus must be involved to meet all the elements of claim 9. A base station apparatus that has transmitting circuitry and processor circuitry capable of performing the recited functions in the described environment would infringe. No other components are required.

Furthermore, the written description makes clear that the re-acquisition of the first type SIB is the same as the original transmitting and broadcasting of the disclosed SIB using the disclosed circuitry. The specification explains that "[u]pon detection of failure of the SI message acquisition process, as act 14-4 the terminal processor 40 initiates (re)acquisition of the first type

system information, *e.g.*, the MINIMAL SI or SIB1." ('557 Patent, 15:47–50; *see also* FIG. 14.) For these reasons, the claim language itself, within the larger context of the patent specification, shows the disputed term is not a method step and is closely tied to the recited structural components of the base station apparatus.

The Court therefore finds **"wherein: the first type SIB is re-acquired by the user equipment upon the user equipment failing on the SI message acquisition process in at least one of the SI windows to receive the SI message" to be not indefinite and adopts its plain and ordinary meaning.**

**U.S. Patent No. 10,601,566**

**3. "the frequency hopping"**

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "the frequency hopping"<br><br>('566 Patent, claims 8, 16) | "[a] frequency hopping" | Indefinite under §112(b) |

The dispute between the Parties is whether the lack of antecedent basis in this claim term renders the claims indefinite.

As a preliminary matter, Plaintiff acknowledges that the phrasing of this term using "the" to preface "frequency hopping" creates an antecedent basis issue because there is not an earlier recitation of "a frequency hopping." However, Plaintiff argues, despite the lack of antecedent basis, this term is still amenable to construction because its meaning is reasonably ascertainable by those skilled in the art. To make its point, Plaintiff refers to unasserted claim 1, which claims a user equipment (UE) that determines "a method of frequency hopping." Plaintiff asserts that the base station (gNB) in claim 8 is the complement of the UE in claim 1 in the communication

process, such that "the frequency hopping" in claim 8 specifically corresponds to the UE's transmission of uplink control information (UCI) with frequency hopping as recited in claim 1. Additionally, Plaintiff contends those skilled in the art would understand that, in the context of the written description, claim 8 covers the embodiments of the '566 Patent where a base station receives UCI from a UE with a frequency hopping method because the claim describes the base station as capable of "receiv[ing] uplink control information (UCI) with [] frequency hopping for the configured multiple slots PUCCH." Plaintiff further submits an expert declaration and testimony from Mr. Bates that states frequency hopping "has been pretty much inherent in all of our latest and greatest technologies, and this dates back even back to before the 2G series" and is "inherent [] in our cellular networks." (Dkt. 70-7 at 30:2–17.)

Defendants submit that the lack of antecedent basis for "the frequency hopping" renders it indefinite because the term is now subject to two reasonable interpretations having different scope: (i) a frequency hopping, and (ii) a method for frequency hopping. As claim 1 introduces "frequency hopping" as "a method of a frequency hopping for the configured multiple slots PUCCH," Defendants argue that for claims 8 and 16 to be read consistently, it must also say "a method of frequency hopping." As "a method of frequency hopping" has a different meaning from "a frequency hopping," Defendants contend that this term must be indefinite.

Claim 8 of the '566 Patent reads as follows:

> 8. A base station (gNB), comprising:
>
> a processor; and
>
> memory in electronic communication with the processor, wherein instructions stored in the memory are executable to:
>
> transmit, to a user equipment (UE), a signaling, an uplink control channel (PUCCH) spans over multiple slots being determined based on the signaling; and
>
> receive uplink control information (UCI) with **the frequency hopping** for the configured multiple slots PUCCH, wherein
>
>> the number of symbols of the PUCCH is the same in each slot of the multiple slots, and
>>
>> the location of the symbols for the PUCCH is the same in the each slot of the multiple slots.

The Parties agree that the disputed claim term, "the frequency hopping," lacks antecedent basis so the Court must assess whether the scope of the claim would be reasonably ascertainable by one of skill in the art in light of the other claims and the written description. However, the failure to provide explicit antecedent basis for a claim term does not always render a claim indefinite. If the scope of the claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite. *Bose Corp. v. JBL, Inc.,* 274 F.3d 1354, 1359 (Fed. Cir 2001).

The '566 Patent is directed to communication between the user equipment (UE), such as a mobile phone, to an access node or base station (gNB). Transmissions from the UE to gNB are referred to as an uplink and transmissions from the gNB to the UE are referred to as a downlink. The referred uplink control channel (PUCCH) and uplink control information (UCI) recited in claim 8 are therefore about the transmissions received by the gNB from the UE.

Although unasserted, it is instructive to review claim 1 because it is an apparatus claim that describes the UE side whereas claim 8 describes the base station side. The two systems work

together to exchange information across uplink to the gNB and downlink to the UE channels. Claim 1 reads as follows:

> 1. A user equipment (UE), comprising:
>
> a processor; and
>
> memory in electronic communication with the processor, wherein instructions stored in the memory are executable to:
>
> determine an uplink control channel (PUCCH) spans over multiple slots based on a signaling from a base station (gNB);
>
> determine a method of a frequency hopping for the configured multiple slots PUCCH; and
>
> transmit uplink control information (UCI) with the frequency hopping, wherein
>
>> the number of symbols of the PUCCH is the same in each slot of the multi slots, and
>>
>> the location of the symbols for the PUCCH is the same in the each slot of the multiple slots.

Claim 1 describes how the UE, with a signaling from a base station (gNB), is capable of determining the PUCCH spanning over multiple slots, determining a method of frequency hopping for the configured multiple slot PUCCH, and transmitting "uplink control information (UCI) with the frequency hopping." On the other end, the claim 8 base station (gNB) is capable of receiving "uplink control information (UCI) with the frequency hopping." Read in context of each other, the UE determines the method of frequency hopping for the PUCCH and transmits the UCI along with the determined frequency hopping to be received by the base station. Therefore, when the base station receives the UCI, it arrives with the frequency hopping already determined for the multiple slots of PUCCH. Whether the frequency hopping is "a frequency hopping" or "a method of frequency hopping" is irrelevant as both are about frequency hopping and therefore encompassed

by the claim. Indeed, Defendants have submitted no expert declaration explaining how such an interpretation would not make sense to one of skill in the art.

The written description is also full of references to frequency hopping, and specifically to frequency hopping in relation to uplink control information (UCI) spanning over multiple slots and received by a base station. (*See, e.g.*, '566 Patent 3:3–63, 5:44–55, FIGS. 33, 35.) Moreover, the specification emphasizes that "[f]requency hopping is a key feature for PUCCH to provide frequency diversity." (*Id.*, 17:5–6.)

Mr. Bates's expert report further supports this interpretation by explaining that "[a] POSITA would have understood that Claim 8's recitation of 'receiv[ing] uplink control information (UCI) with the frequency hopping for the configured multiple slots PUCCH' directly corresponds to the UE's transmission of UCI with frequency hopping, as described in Claim 1." (Dkt. 70-6, ¶ 47.) Mr. Bates opined that frequency hopping is an inherent feature of configured multiple slots PUCCH, as claimed, due to the base station's ability to receive UCI from a UE with frequency hoping. (*Id.*, ¶ 48.) Therefore, "a POSITA would have readily understood Claim 8 of the '566 Patent to refer to 'receiv[ing] uplink control information (UCI) with [] frequency hopping for the configured multiple slots PUCCH.'" (*Id.*, ¶ 45.)

Within the context of the specification and claims, the Court finds Mr. Bates's opinion to be credible in determining that this term has a reasonably ascertainable meaning. Claim 16 is a method claim that corresponds to apparatus claim 8 so the same reasoning applies.

Accordingly, the Court finds **the term "the frequency hopping" is not indefinite and should be construed as "[] frequency hopping."** The Court does not find adding the "a" before "frequency hopping" is necessary to establish antecedent basis of the term when "frequency hopping" is an inherent characteristic of the UCI as described.

## V. CONCLUSION

The Court adopts the constructions as set forth in this opinion for the disputed terms of the Asserted Patents. The Parties are **ORDERED** that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the Parties are **ORDERED** to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**So ORDERED and SIGNED this 11th day of October, 2024.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE